Filed 1/8/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NOREEN CARDINALE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DANIEL R. MILLER, JR., et al.,<br><br>      Defendants and Appellants. | A132611<br><br>(Contra Costa County<br>Super. Ct. No. MSC0800657) |
| NOREEN CARDINALE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>KEITH KNAPP et al.,<br><br>      Defendants and Appellants. | A133065<br><br>(Contra Costa County<br>Super. Ct. No. MSC0800657) |

Keith Knapp and his company Home Loan Service Corporation (CHL) tread a path to this court that is well-worn by their various codefendants in Noreen Cardinale's long-fought action arising from an abusive loan scheme. (See *Cardinale v. Miller* (May 17, 2010, A125546) [nonpub. opn.] (*Cardinale v. Miller 3*); *Cardinale v. Miller* (Jan. 31, 2005, A100606 & A101914) [nonpub. opn.]; see also *Cardinale v. Fitz-Stephens* (May 28, 2002, A093851) [nonpub. opn.].) After a jury found Knapp and CHL[1] liable for conspiring to engage in fraudulent transfers to avoid enforcement of Cardinale's judgments against Daniel Miller, Jr. (Miller), they contend the evidence is insufficient to

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts one, two, and three of the Discussion.

[1] For convenience, we will refer to Knapp and CHL jointly as appellants or the broker defendants.

1

support the judgment, the special verdict form was critically flawed, the jury's findings are irreconcilably inconsistent, and there was no legal basis for an award of attorneys' fees. In the unpublished portion of this opinion we conclude that, in most significant respects, these assertions have no merit. However, our review of the record confirms that a portion of the damage award lacks evidentiary support, and it must be reduced. Accordingly, we modify the damage award and affirm the judgment as modified. In the published portion of this opinion we affirm the award of attorneys' fees.

## BACKGROUND

Much of the history of this case is discussed in our prior opinions, and we will repeat only what is necessary to explain our disposition. In 2008, some 10 years after she first sued Miller and others for fraud and related torts, Cardinale sued Miller, Knapp, and various other individuals and entities to enforce the judgment she won against Miller in her fraud suit and a related bankruptcy action. Her complaint alleged that Miller, aided and abetted by other defendants, operated a "refinance Ponzi scheme" through which he shielded his assets from Cardinale's attempts to collect on her judgments. The complaint alleged Miller did this by obtaining loans on properties he owns and controls through sham entities and family members, and converting the loan proceeds to his own personal use. He would then either force a discounted payoff of prior loans without recording a reconveyance, so that to his creditors the properties appeared to have no equity, or would simply allow the loans to default.

Cardinale alleged that Knapp and CHL salesperson Derald Kenoyer conspired in this scheme to drain the equity from Miller's property by brokering at least 23 loans for Miller's sham entities in exchange for highly remunerative brokerage commissions. Knapp "knew or should have known that Miller was the actual recipient of the loan proceeds, that the point of Miller and Kenoyer's enterprise was to defraud Miller's creditors, and that Miller had a dismal record of defaults and foreclosures. Knapp allegedly allowed Miller and Kenoyer's activities to continue so he could reap

2

extravagant commissions.  The complaint alleged Knapp knew Kenoyer was arranging the loans without loan applications, reference to lending standards, or regard to the borrowers' creditworthiness; that Knapp knew or should have known the borrowing entities were a sham; and that the loans were inadequately secured and being used to get money out of the secured properties.  The complaint further allege[d] Knapp deliberately breached his duty to supervise and regulate Kenoyer because Kenoyer's activities were extremely profitable." (*Cardinale v. Miller 3, supra,* p. 3.)

The trial court sustained Knapp's demurrer to Cardinale's cause of action for conspiracy to commit fraudulent transfers, but this court held the complaint sufficiently stated a claim for fraudulent transfers against Miller and the related conspiracy claim against the broker defendants.  (*Id*. at pp. 4-6.)  In the meantime, Cardinale obtained a default judgment against Miller.  After she prevailed on her appeal, Cardinale proceeded to a jury trial against the broker defendants and Daniel Miller, Sr. (Miller Senior). [2]

We will save most discussion of the evidence for our discussion of the discrete legal issues raised by this appeal.  Suffice it to say that the jury found in favor of Cardinale on all issues.  There were fraudulent transfers of property interests from Miller to other defendants; Miller controlled the entities that held title to the subject properties; and he fraudulently transferred his legal or equitable interest in one or more of those properties.  On the conspiracy count, the broker defendants and Miller Senior were found to have conspired with or aided and abetted Miller "in stripping his equity in properties for the purpose of hindering, delaying or defrauding" Cardinale, and that their conduct was a substantial factor in causing her loss.  The jury awarded compensatory damages of $2,170,593.  In a second phase of trial on punitive damages, the jury added a punitive

---

[2] Miller Senior, Miller's father, settled with Cardinale after trial and has dismissed his appeal from the judgment.  Defendants Kenoyer and Patrice Miller, Miller's wife, filed bankruptcy proceedings shortly before trial.  To avoid confusion, we will refer to Patrice Miller by her first name.

award of $900,000, comprised of $300,000 against Knapp individually, $500,000 against CHL, and $100,000 against Miller Senior. Cardinale was also awarded $293,937.50 in attorneys' fees.

This appeal timely followed.

## DISCUSSION

### I. Substantial Evidence Supports The Jury's Findings

The complaint alleged a cause of action for enforcement of judgments against Miller and sham entities Pashlin Inc. (Pashlin) and Villa Diamante LLC (Villa Diamante). As to all defendants, the complaint alleged fraudulent transfers and conspiracy to engage in fraudulent transfers under the Uniform Fraudulent Transfer Act (UFTA, Civ. Code § 3439 et seq.).[3] A fraudulent transfer under the UFTA "involves ' "a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." ' [Citation.] 'A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer as follows: [¶] (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.' (§ 3439.04, subd. (a).)" (*Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 829-830.)

The broker defendants contend they cannot be liable for conspiring to commit fraudulent transfers because, under their theory, there was no evidence that anyone committed tortious acts surrounding the alleged fraudulent transfers. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*

---

[3] Additional causes of action for the appointment of a receiver, injunctive relief, and issuance of charging orders and alter ego findings are not at issue in this appeal.

4

(1994) 7 Cal.4th 503, 510-511 (*Applied Equipment*).) Here, the underlying tortious acts are the fraudulent transfers under UFTA. (See generally *Filip v. Bucurenciu, supra,* 129 Cal.App.4th at p. 837 [affirming judgment for conspiring to transfer property in violation of the UFTA].)

Appellants' argument takes a bit of explaining. They assert there was no underlying UFTA violation here because the jury was instructed that a necessary element of the offense was that Miller "transferred property to *Defendants.*" (Italics added.) But, they say, it is undisputed that they were never the recipients of any such transfers, and the only other defendant remaining in the case by the time it went to the jury was Miller Senior. As for Miller Senior, they assert that "[o]f all the transactions in evidence, there is no document or any other evidence indicating any transfer of any kind by Miller Junior (or any entity) to Miller Senior."

First and foremost, the UFTA requires only that a fraudulent transfer be made to a third party, not to a defendant. (Civ. Code, § 3439.04, subd. (a).) The jury was properly instructed on the elements of a fraudulent transfer under the UFTA,[4] and found that Miller made such transfers. The simple fact that the instruction referred to transfers to "Defendants" rather than more generally to third parties does not undermine the jury's finding that Miller violated the UFTA.

---

[4] The jury was instructed under CACI No. 4200 that "Plaintiff Noreen Cardinale claims she was harmed because Daniel R. Miller, Jr. fraudulently *transferred property to Defendants* in order to avoid paying a debt to her. To establish this claim against Defendants, she must prove all of the following: [¶] 1. That Plaintiff Noreen Cardinale has a right to payment from Daniel R. Miller Jr. for her unpaid judgment; [¶] 2. That Daniel R. Miller, Jr. transferred property to Defendants; [¶] 3. That Daniel R. Miller, Jr. transferred the property with the intent to hinder, delay or defraud one or more of his creditors; [¶] 4. That Plaintiff was harmed; and [¶] 5. That Daniel R. Miller Jr.'s conduct was a substantial factor in causing Plaintiff's harm; [¶] To prove intent to hinder, delay or defraud creditors, it is not necessary to show that Daniel R. Miller, Jr. had a desire to harm his creditors. Plaintiff Noreen Cardinale need only show that Daniel R. Miller, Jr. intended to remove or conceal assets to make it more difficult of [sic] his creditors to collect payment." (Italics added.)

5

Moreover, Cardinale adduced evidence of multiple transactions that involved fraudulent transfers to Miller Senior, Patrice, and Pashlin, all of whom Cardinale named as defendants. Appellants' failure to address the evidence in their opening brief or to identify parts of the trial record that would demonstrate its purported absence warrant treating the claimed error as waived. " 'When appellants challenge the sufficiency of the evidence, all material evidence on the point must be set forth and not merely their own evidence. [Citation.] Failure to do so amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact.' " (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, pp. 769-771.) But the assertion also fails for its lack of merit. There was ample evidence from which the jury could reasonably find fraudulent transfers to Miller Senior. Appellants' contentions that specific transfers were either not made *by* Miller (Junior), or *to* Miller Senior, were resolved against them at trial, and we will not disturb those factual determinations. "In so far as the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to the support of the judgment." (*Mah See v. North American Accident Ins. Co.* (1923) 190 Cal. 421, 426; 9 Witkin, *supra*, Appeal, § 376, p. 434.)

Taking a slightly different tack, appellants contend that transfers to Patrice and Pashlin do not establish UFTA violations because the jury instructions did not explicitly identify them as "defendants," or, alternatively, because these two defendants were not before the court at trial because of their default or bankruptcy. Nonsense. There is no basis in the record, or, for that matter, in logic, for appellants' claim that the jury could not consider transfers to these two named defendants in assessing Cardinale's claims under the UFTA; any other conclusion would pointlessly elevate form over substance. Appellants further assert for the first time in their reply brief that the evidence does not show any fraudulent transfers to Pashlin, but the claim violates our proscription against raising arguments for the first time in a reply brief. "Obvious considerations of fairness

6

in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 616, pp. 647-648; *Granite Construction Co. v. American Motorists Ins. Co.* (1994) 29 Cal.App.4th 658, 667, fn. 8.) Moreover, although the jury instructions might not have explicitly identified Patrice and Pashlin as defendants, the jury was instructed, without objection, that "transfers of title or rights to purchase real property from Daniel R. Miller, Jr. to controlled entities or to Patrice Miller and Daniel R. Miller, Sr. is a 'transfer.' "[5] There is no basis here to disturb the jury's findings.

## II. The Jury's Findings Were Sufficient To Establish Liability

In a variation on their theme that there can be no liability for conspiracy without proof of an underlying wrong, the broker defendants next assert they cannot be held liable for conspiring in or aiding and abetting Miller's fraudulent transfers because "[t]he special verdict lacked any finding that equity stripping occurred." This argument, too, is meritless. The jury's findings in response to questions in the special verdict state that Miller fraudulently transferred his assets to sham entities under his dominion and control, and that the broker defendants conspired with or aided and abetted him "in stripping his equity in properties for the purpose of hindering, delaying or defrauding" Cardinale. Appellants concede that this latter finding "comports with the conspiracy and aiding and abetting instructions because they mention hiding assets and stripping equity," but they argue that "what's missing is any finding that equity was, *in fact,* stripped."

---

[5] As originally proposed this instruction explicitly included transfers of equitable title to property. Counsel for appellants objected to the phrase "equitable title," and it was deleted from the court's charge to the jury. Appellants voiced no other objection to this definition.

Perhaps the special verdict could have been more explicit. But, its meaning is sufficiently clear to show the jury made the necessary findings. (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456-457 [courts interpret verdict from its language considered in connection with the pleadings, evidence and instructions]; *Irelan-Yuba Gold Quartz Mining Co. v. Pacific Gas & Electric Co.* (1941) 18 Cal.2d 557, 570 [verdict construed with reference to instructions].) In accordance with Cardinale's theory of the case, the jury was instructed that Cardinale "claims that she was harmed by [Miller's] fraudulent transfers to hide assets and drain asset equity, and that each of the defendants has responsibility for the harm because each defendant aided and abetted [Miller] in committing these acts. [¶] . . . If you find that [Miller] engaged in fraudulent transfers to hide assets and drain asset equity that harmed [Cardinale], then you must determine whether any of the defendants is also responsible for the harm. A defendant is responsible as an aider and abetter if [Cardinale] proves all of the following: [¶] 1. That the defendant knew that [Miller] was engaged in fraudulent transfers to hide assets and drain asset equity in order to avoid payment of [Cardinale's] judgments . . . ." The jury was also instructed that " '[t]ransfer' means every method of parting with a debtor's property or an interest in a debtor's property," including through the "payment of money/release/lease/the creation of a lien or other encumbrance."

On the conspiracy cause of action, the jury was instructed that "[i]f you find that [Miller] committed a fraudulent transfer that harmed [Cardinale], then you must determine whether Defendants are also responsible for the harm," and that if any defendant "joined the conspiracy to commit fraudulent transfers by aiding and abetting [Miller] to hide assets and drain asset equity," then that defendant was liable for all acts done as part of the conspiracy.

The jury found that Miller committed fraudulent transfers and that appellants conspired or aided and abetted him "in stripping his equity in properties for the purpose of hindering, delaying or defrauding" Cardinale. The jury also found that Cardinale was

8

harmed by the conspiracy. In the context of the instructions and the theory of Cardinale's case as expressed to the jurors from start to finish, the "equity stripping" was one factor that made the transfers fraudulent. It is therefore not fatal that the verdict form did not include an express finding that Miller in fact stripped equity from the properties. Such a conclusion is implicit in the jury's finding of harm. To the extent appellants now complain the verdict form was insufficient for failing to include a specific finding of equity stripping, they waived the claim by failing to object and request a "more formal and certain verdict" at trial. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530 (*Behr*).)

Appellants also contend the jury's fraudulent transfer findings are inconsistent with its conspiracy findings. To some extent this contention merely repeats their prior argument. Beyond that, their precise point is somewhat difficult to discern. The nub seems to be that the jury was not asked to find that appellants conspired in making the *same* fraudulent transfers that Miller had made. This, again, simply ignores the allegations of the complaint, the jury instructions, and, indeed, the heart of Cardinale's theory. It also defies common sense, as the jury's verdict states that Miller fraudulently transferred his interest in the subject properties, that the broker defendants conspired with him in thus "stripping his equity in [those] properties for the purpose of hindering, delaying or defrauding" Cardinale, and that Cardinale was harmed by the scheme. There is no conflict between those findings. In any event, again, it was the broker defendants' obligation to point out any possible ambiguity in the verdict form at trial. They did not, so the claim is waived. (*Behr, supra,* 193 Cal.App.4th at p. 530.)

**III. Damages**

Appellants next challenge the compensatory award of $2,170,593. They contend the amount is unsupported to the extent it exceeds the $1,387,817 amount of Cardinale's judgments with accrued interest at the time of trial or the $377,460 in cash they claim Miller garnered from the fraudulent loan transactions. They also assert the award cannot include any proceeds of Miller's fraudulent loans that were disbursed to his other

9

creditors instead of Cardinale. The first of these contentions, only, has merit, and requires us to reduce the award.

Cardinale's essential problem is that neither the trial record nor her appellate brief identifies a theory or evidence that can support an award of damages beyond the amount owed on the uncollected judgments. To the contrary, all indications in the record are that Cardinale provided the jury with no other basis for computation of damages.[6] Her pretrial issue conference statement, for example, said that "[t]he amount of damages in this case, since the lost equity [due to the fraudulent transfers] far exceeds it, is the amount of the judgment," which she identified as $1,372,132.87 at that time. Her trial brief plainly stated that the sum of the unpaid judgments "represents the damages claimed by Plaintiff in this action." Cardinale neither testified nor introduced evidence of other harm she suffered as a consequence of defendants' scheme, and her counsel made no mention of other consequential harm in her opening statement, closing argument, arguments to the court about jury instructions—or, as far as we can discern, at any other point during trial.

Nor do the jury instructions identify a basis for an award in excess of the value of the judgments. The jury was broadly instructed to compensate Cardinale for "each item of harm that was caused by Defendants' wrongful conduct, even if the particular harm could not have been anticipated" (CACI No. 3900) and instructed to base the award on the evidence rather than argument or speculation and not to include the attorneys' fees or expenses Cardinale incurred in bringing this suit. (CACI Nos. 3925, 3964.) More specifically, the jury was instructed that Cardinale "claims she was harmed because Daniel R. Miller Jr. transferred property to Defendants and, as a result, was unable to pay Plaintiff money that she was owed" and "because Daniel R. Miller, Jr. fraudulently transferred property to Defendants in order to avoid paying a debt to her." A special

---

[6] Cardinale also sought and obtained punitive damages, which appellants have not challenged on appeal.

instruction captioned "Instruction On Plaintiff's Claim For Damages" stated that "[t]he current amount of the unpaid Judgment in favor of Ms Cardinale against Daniel R Miller Jr. is $1,379,937.09. [¶] The current amount of the unpaid judgment of the bankruptcy court against Daniel R Miller Jr. is $7,873.32. [¶] Mr. Daniel R. Miller, Jr. already owes these judgments. Plaintiff is not asking you to award these amounts a second time against Daniel R. Miller, Jr." The verdict form provided no additional guidance on damages, but simply asked the jury to specify the amount of Cardinale's harm or loss.

Appellants moved for a new trial because, in part, Cardinale had neither alleged nor presented evidence of damages beyond the amount owed on the judgments. In opposition, Cardinale offered the bare suggestion that damages "may well include disgorgement of profits and unjust enrichment." She repeats this on appeal and adds that there was evidence Miller Junior profited "well beyond the amount of any underlying judgments," while the broker defendants were paid some $335,000 in commissions for their participation in his schemes. But, as in the trial court, she identifies nothing in the record showing that she alleged or pursued any such quasi-contractual recovery of defendants' ill-gotten gains. Nor does she identify any evidentiary basis for the some $783,000 in excess of her judgments against Miller.

"The measure of damages for torts is generally 'the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.' (Civ. Code, § 3333.)" (*Behr, supra,* 193 Cal.App.4th at p. 533.) Reviewing this record in the light most favorable to the judgment and according due weight to the trial court's rejection of appellants' claim of excessive damages (see *Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259), we are constrained to conclude that the record contains no support for a compensatory award in excess of the amount of Cardinale's outstanding judgments. Accordingly, we will modify the judgment by reducing the award to $1,387,810.41. (See, e.g., *Behr, supra,* at p. 535.)

11

Appellants' other challenges to the compensatory award are meritless. They claim Cardinale can recover no more than $377,460, the amount of cash they assert Miller directly pocketed from the loan transactions. Not so. Cardinale's theory was that Miller was in constructive receipt of all funds loaned due to the equity-stripping scheme and that "[h]ad [her] lien attached as it should have, but for this scheme her secured judgment would have been satisfied *first*, before any loans could even be placed in order to generate payments to *other* creditors out of [the] proceeds." She introduced ample evidence that Miller, with appellants' assistance, extracted funds from his many properties well in excess of the amount of the judgment debt. That he directed substantial portions of those sums to other creditors instead of satisfying Cardinale's superior judgment lien in no way diminishes the harm she suffered when he siphoned off the equity from his properties to prevent her from reaching it.

Appellants went further at oral argument, asserting that Cardinale was not harmed by Miller's use of loan proceeds to pay off other creditors because those transactions merely refinanced existing loans secured by the respective properties, and therefore he could not have stripped additional equity from them. This assertion was forfeited by appellants' failure to address it in their written briefs. In any event, the jury rejected appellants' characterization of those transactions, apparently in favor of Cardinale's position that Miller chose to use loan proceeds to pay off whichever of his creditors he wanted to satisfy for his own business purposes. Appellants have not shown that the complex and voluminous evidence, including loan documents prepared and signed by the various participants in Miller's enterprise and closing statements showing the disbursement of funds to various entities, compels any different conclusion.

Appellants' final argument on damages goes further still. They claim the jury's award was so grossly disproportionate to the harm suffered that "nothing short of a complete new trial—on both liability and damages—will do justice." Not surprisingly, we disagree. Based on an enormous amount of complex evidence, the jury found

12

appellants conspired to bilk Cardinale by means of a strikingly pervasive scheme of financial fraud. The numbers were large, the transactions were many, and the arguments and instructions on damages provided less guidance than they optimally might have. Just because we cannot discern from the record exactly how the jury calculated its award does not suggest to us that it "either misapprehended or ignored what it was supposed to be deciding." Nor is the award "so grossly disproportionate as to raise a presumption that the panel based its result on passion or prejudice." (See *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1252.) Appellants' insistence that the amount of the award "mandates a new trial on all issues" is incorrect.

### IV. Attorneys' Fees

Cardinale moved for attorneys' fees under Code of Civil Procedure section 685.040,[7] which authorizes a judgment creditor to recover fees incurred in enforcing a judgment if the underlying judgment included an award of fees as costs.[8] (§§ 685.040, 1033.5, subd. (a)(1).) The court found section 685.040 applied and awarded Cardinale $293,937.50 in reasonable and necessary attorneys' fees. Appellants challenge only the statutory basis for awarding fees in an UFTA action where the defendants ordered to pay the fees are third parties to the underlying contractual fee provision. The issue presents a strictly legal question, which we review de novo. (*Jaffe v. Pacelli* (2008) 165 Cal.App.4th 927, 934 (*Jaffe*).)

Appellants correctly state that UFTA does not itself authorize a fee award, and Cardinale concedes the point. The question, rather, is whether section 685.040 supports an award of fees as costs against a party who conspires to help a judgment debtor evade efforts to enforce a judgment that includes a contractual fee award. The answer lies primarily in the statutory language. Section 685.040 provides: "The judgment creditor is

---

[7] Unless otherwise noted, further statutory citations are to the Code of Civil Procedure.
[8] It is undisputed that Cardinale's underlying judgment against Miller included an award of contractual fees.

13

entitled to the reasonable and necessary costs of enforcing a judgment. Attorney's fees incurred in enforcing a judgment are not included in costs collectible under this title unless otherwise provided by law. *Attorney's fees incurred in enforcing a judgment are included as costs collectible under this title if the underlying judgment includes an award of attorney's fees to the judgment creditor pursuant to subparagraph (A) of paragraph (10) of subdivision (a) of Section 1033.5.*" (Italics added.) Review of section 1033.5, subdivision (a)(10)(A), shows that attorneys' fees may be recovered as costs when authorized by contract.

Appellants contend that section 685.040 authorizes the recovery of fees only from the original judgment debtor, and therefore that they, as nonparties to the underlying judgment, are beyond its reach. But section 685.040 does not say so. Rather, it imposes just "two requirements before a motion for an award of postjudgment attorney fees may be awarded as costs: (1) the fees must have been incurred to 'enforce' a judgment; and (2) the underlying judgment had to include an award for attorney fees pursuant to Code of Civil Procedure section 1033.5, subdivision (a)(10)(A). . . ." (*Jaffe, supra,* 165 Cal.App.4th at p. 935.) Cardinale's action satisfies both criteria. While in the usual scheme of things the target of a fee motion under section 685.040 is presumably the original judgment debtor, the Legislature did not so restrict the provision's scope. Rather, the statute by its terms is broad enough to encompass fees expended to enforce a judgment against third parties who conspired with the judgment debtor to evade its enforcement. We are not at liberty to narrow the statutory language " 'to make it conform to a presumed intention which is not expressed.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633; *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 582 [" 'If the [statutory] language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.' "].)

14

Nor is it critical here that appellants were not parties to the contractual fee provision between Miller and Cardinale. As *Jaffe* explains, "[g]enerally, when a judgment is rendered in a case involving a contract that includes an attorney fees and costs provision, the 'judgment extinguishes all further contractual rights, including the contractual attorney fees clause.' " (*Id.,* 165 Cal.App.4th at p. 934.) As a consequence, attorneys' fees incurred to enforce such a judgment can only be recovered if there is express statutory authorization, such as is provided by section 685.040. (*Ibid.*) "Pursuant to the current version of the statute, the award of postjudgment attorney fees *is not based on the survival of the contract, but is instead based on the award of attorney fees and costs in the trial judgment.* [Citation.] This is in accord with the extinction by merger analysis providing that postjudgment rights are governed by the rights in the judgment and not by any rights arising from the contract." (*Id.* at p. 935, italics added.) Appellants' status as strangers to Cardinale's contract with Miller does not immunize them from liability under section 685.040.

Appellants also contend the fee award is improper because "the action against [them] was not to enforce the judgment but rather to pursue an independent tort claim" sounding in conspiracy. Their premise mischaracterizes both the facts and the law. As a factual matter, this action *was* to collect the unpaid judgment—as appellants themselves vociferously note in challenging the damages awarded in excess of that amount. On the law, "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. [Citation.] In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (*Applied Equipment, supra,* 7 Cal.4th at pp. 510-511.) Plainly, Cardinale's legal pursuit of the broker defendants was no less to enforce the judgment than was her fraudulent transfer

15

claim against Miller.  We conclude the fee award was authorized under section 685.040, and the broker defendants are liable for Cardinale's fees even though they were neither parties to the original action giving rise to the judgment or the contract on which that judgment was based.

## DISPOSITION

The award of compensatory damages in the judgment is reduced to $1,387,810. As so modified, the judgment is affirmed.  Cardinale is entitled to her costs on appeal.

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.

Trial Court:                                    Contra Costa County Superior Court


Trial Judge:                                    Hon. Judith S. Craddick


Counsel for Defendants and Appellants:          Law Offices of Michel Heath:
                                                  Michael T. Health

                                                Greines, Martin, Stein & Richland:
                                                  Robin Meadow
                                                    and
                                                  Sheila A. Wirkus

                                                Rice & Bronitsky:
                                                  Charles Bronitsky
                                                    and
                                                  Julia Wei


Counsel for Plaintiff and Respondent:           Caron & Associates:
                                                  Martha L. Caron

                                                Law Offices of Mary Margaret Bush:
                                                  Mary M. Bush